

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     vs.<br><br>JOSE SAMANIEGO and<br>PATRICK ANTHONY WALKER,<br><br>          Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

NO.   CR 06-01819-TUC-RCC (BPV)

**REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTIONS TO
SUPPRESS**

          On November 1, 2006, Defendants Jose Samaniego and Patrick Anthony Walker were indicted for conspiracy to possess with intent to distribute and possession with intent to distribute 138 kilograms of marijuana (Docket # 10).  On August 3, 2007, Defendant Samaniego filed a Motion to Suppress (Search) (Docket # 65) and on August 7, 2007, Defendant Walker filed a Motion to Suppress (Evidence) (Docket # 66), which included a joinder in Defendant Samaniego's Motion to Suppress.  The Government filed its Responses on September 14, 2007 (Docket # 69 and # 70).  Defendant Walker filed his Reply on September 24, 2007 (Docket # 73) and Defendant Samaniego filed his Reply on September 27, 2007 (Docket # 74).  On September 27, 2007, Defendant Walker filed a Joinder to Defendant Samaniego's Reply (Docket # 75).

          The matter came on for Evidentiary Hearing before the Court on October 9, 10, and 16, 2007.  The Government called as witnesses Agents Bryna Warnock, Robert Payne, Alex Lopez, Louie Garcia, Erik White, Sean Greene, and Alexander Zamora.  The Defendants

1  called as witnesses Yolanda Luna, Gabrielle Varvel, Jasmine Varvel,  Kasey Varvel, Chris

2  Blattner, Jose Samaniego, Jr.,  Defendant Samaniego, and Crystal Samaniego.

3      The Court, having considered the briefing, arguments, and evidence presented,

4  recommends that the District Judge, after his independent review and consideration, enter an

5  order **GRANTING** Defendants' Motions to Suppress the search and evidence.

6                                    **FACTS**

7      Agents Alex Lopez and Bryna Warnock observed Defendants Samaniego and Walker

8  at the Choice Hardware Store on Benson Highway purchasing four rolls of shrink wrap.

9  Shrink wrap is commonly used to package marijuana and, when purchased in large

10  quantities, raises suspicions of trafficking in marijuana.  Agents Lopez and Warnock

11  informed Special Agent in Charge Louie Garcia of their observations and the location of

12  Defendants Samaniego's and Walker's destination in Vail, Arizona.

13      Agent Garcia took charge of the proposed knock and talk operation.  He requested that

14  all agents involved assemble at I-10 and the Sonoita off-ramp (Highway 83).  En route,

15  Agent Garcia called the air branch for air support to bolster security at the suspected stash

16  house.  While at least eight agents traveled en route to the staging area, two were sent to the

17  Vail Fire Department Station (formerly a winery) to observe Defendant Samaniego's house,

18  which was located south across the freeway.

19      The officers in the knock and talk were in civilian vehicles and clothing, but wore law

20  enforcement identifying vests.  All were carrying holstered firearms.

21      Agent Garcia testified that the column of agents traveled to the Samaniego residence

22  at speeds of two to five miles per hour so as to not create any dust.  The neighbors testified

23  that the vehicles approached at 20 to 30 miles per hour and raised columns of dust.  Agent

24  Garcia said the helicopter was told to fly high and out of sight.  The neighbors said the

25  helicopter was loud and flying low; so low that one witness could see the soles of the shoes

26  of an occupant of the helicopter.  Others stated that it raised a lot of dust.  The neighbors who

27  testified are not friends of the Samaniegos and do not care for them.

28      Agent Garcia said the helicopter was at the scene for ten minutes.  Civilian witnesses

1    said it was there during the entire operation.  The air branch log showed the helicopter on the
2    scene for about 30 minutes.

3           Agent Garcia testified that he and Agent Lopez were the only ones who approached
4    the house.  Agent Erik White testified that he and another agent in a separate vehicle
5    followed Agents Garcia and Lopez onto the Samaniego property and that he and his partner,
6    Robert Payne, stood on either side of their vehicle in view of the Samaniego trailer.  At this
7    time, there may also have been on the property two agents in a third vehicle.

8           According to Agent Garcia, all other law enforcement vehicles remained in a column,
9    obscured from view by a blocking fence on the Samaniego property.  Neighbors stated that
10   at least two vehicles with three agents drove to an area behind the Samaniego house and the
11   neighbors' residences and, from there, the agents walked along the road and then towards the
12   Samaniego residence.

13          Agents Garcia and Lopez walked onto the Samaniego porch, where Agent Garcia
14   knocked on the door two to three times.  Defendant Samaniego answered the door.  Agent
15   Garcia claimed that he advised Defendant Samaniego that they had information of illegal
16   aliens or drugs at the residence and asked whether he would consent to a search.  Defendant
17   Samaniego claimed that, in response to a statement made by Agent Garcia about illegal aliens
18   only, Defendant Samaniego asked if they had the right house.  Agent Garcia followed this
19   statement with a question as to whether the Defendant would mind if they searched the
20   premises.  According to Agent Garcia, he informed Defendant Samaniego that the consent
21   would have to be voluntary and that Defendant Samaniego responded he did not mind.
22   Defendant Samaniego claimed that he responded that "you're already in."

23          Once Agent Garcia told Agent White that consent had been obtained, eight to nine
24   vehicles came onto the property.  Thereafter, three agents, with guns at the ready, conducted
25   a protective sweep of the area.

26          According to Agent Garcia, consent was obtained as the result of a calm discourse
27   with the interested parties.  Defendant Samaniego claimed Agent Garcia was yelling. At the
28   hearing, Defendant Samaniego testified that  his consent was not an issue for Agent Garcia.

1  No written consent to search was sought or obtained.

2  Defendant Samaniego's wife and children described an entry procedure utilized by

3  Agent Garcia that was the complete opposite of the Government's position on consent to

4  enter and search.

5  ## DISCUSSION

6  Warrantless searches of a person's home are presumptively unreasonable unless the

7  person consents, or unless probable cause and exigent circumstances justify the search. *See*

8  U.S. CONST. amend. IV.; *Katz v. United States*, 389 U.S. 347, 357 (1967) (4th Amendment

9  imposes presumptive warrant requirement for searches and seizures); *Johnson v. United*

10  *States*, 333 U.S. 10, 14-15 (1948) (4th Amendment requires warrant for search and seizure

11  unless preexisting exception applies).

12  When the Ninth Circuit formulated the general rule regarding "knock and talk"

13  encounters more than forty years ago, however, the Ninth Circuit noted that "there is no rule

14  of private or public conduct which makes it illegal per se, or a condemned invasion of the

15  person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps

16  and knock on the front door of any man's "castle" with the honest intent of asking questions

17  of the occupant there of whether the questioner be a pollster, a salesman, or an officer of the

18  law. *United States v. Davis*, 327 F.2d 301, 303 (9th Cir. 1964).

19  If consent is given, it must be freely and voluntarily given. *United States v.*

20  *Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir.1996) (An individual may waive his Fourth

21  Amendment rights by giving voluntary consent to a warrantless search of his person,

22  property, or premises.) Validity of consent is a question of fact, the resolution of which

23  depends upon the totality of the circumstances. *See United States v. Morning*, 64 F.3d 531,

24  533 (9th Cir.1995). "The government has the burden of proving that consent to a serach was

25  voluntary, and must do so by a preponderance of the evidence." *United States v Bautista*,

26  362 F.3d 584, 589 (2004) (citations omitted).

27  Since the Ninth Circuit's early consideration of the validity of the so called "knock

28  and talk," courts have had an opportunity to refine the formulation somewhat, and determine,

1  under a "totality of the circumstances" approach, whether a  "knock and talk" is truly

2  consensual, or whether coercive actions by the officers turn it into a seizure. *See United*

3  *States v. Jerez*, 108 F.3d 684, 691-92 (7th Cir. 1997); *United States v. Kim*, 27 F.3d 947, 951

4  (3rd Cir. 1994); *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000).

5       It is important to recall, as to the historical context of the "knock and talk," the

6  significance the Ninth Circuit placed, in *Davis*, that the inquiry be "with the honest intent of

7  asking questions of the occupant there." *Davis*, 327 F.2d at 303.  The purpose of the "knock

8  and talk" is to make investigatory inquiry, or to gain voluntary consent to search.

9       Courts have looked to a variety of factors to determine if the encounter was

10  consensual or unduly coercive. *Cormier*, 220 F.3d at 1109 (Where the officer knocked on

11  the door for a short period of time, made no announcement of police officer while knocking,

12  made no compulsion to open the door under badge of authority, and there was no

13  unreasonable persistence, court found no evidence to indicate that the encounter was

14  anything other than consensual.); *United States v. Crapser*, 472 F.3d 1141 (9th Cir. 2007)

15  (Encounter found to be consensual when there was a single, polite knock on the door, no

16  demand to open the door, police asked resident to open the door, police waited patiently and

17  silently for resident to decide that she and defendant were ready to come out, police did not

18  draw attention to their weapons, did not use any form of physical force, made no effort to

19  enter the motel room, the event occurred in the middle of the day, on a sidewalk in public

20  view, with four officers present, police did not block defendant, or suggest they could not

21  leave or return to their room, give them orders or affirmatively assert authority over their

22  movement.); *Orhorhaghe v. I.N.S.*, 38 F.488, 500 (9th Cir. 1994) (Consent involuntary when

23  agents had a four-to-one advantage, agent displayed his weapon, instructed defendant "Let's

24  go into your apartment," informed defendant that they didn't need a warrant to talk to him

25  in an attempt to mislead defendant about the need for a warrant to enter the apartment.);

26  *United States v. Enslin*, 327 F.3d 788, 795 (District Court did not err in finding consent when

27  marshals did not have their guns drawn and resident was not in custody, and was never

28  arrested.)

1    On the critical issue of consent, no defense or prosecution witnesses, except for Agent

2    Garcia, supported a finding that an unequivocal consent was obtained or that, if obtained, the

3    consent was voluntary and free of coercive Government conduct.  In assessing the credibility

4    of witnesses, one is often confronted with the traditional "she said/he said."  In this case, the

5    issue is easier because, in matters other than consent, the other factual disputes herein are

6    defined as "he said/they said."  From this, the Court concludes that, on the critical issue

7    before the Court as to consent, the admittedly biased Samaniego family witnesses, supported

8    by unbiased neighbors, presented a more accurate view of what occurred on October 6, 2006.

9    Interestingly, when Agent Garcia was asked the irrelevant question of how successful

10   he was at obtaining consent on his "knock and talks," he responded, over a sustained

11   objection, "one-hundred percent."  The Court questions, in light of the discrepant testimony

12   presented at this hearing, whether such a high success rate represents true intentional waivers

13   of constitutional rights or whether such success is perhaps more illustrative of involuntary

14   submission to authority.

15   The Court finds, considering the totality of the circumstances, that Defendant

16   Samaniego's consent, if obtained, was not voluntary.  *United States v. Castillo*, 866 F2d 1071

17   (9th Cir. 1989); *United States v. Carbajal*, 956 F2d 924 (9th Cir. 1991); and *United States v.*

18   *Gomez*, 479 F3d 350 (5th Cir. 2007).

19   Additionally, even if consent to search was found, consent is generally invalid if an

20   illegal search of seizure occurred before the consent was given.  *See United States v. Colin*,

21   314 F.3d 439, 446-47 (9th Cir. 2002).  An otherwise valid "knock and talk" becomes a seizure

22   requiring reasonable suspicion where a law enforcement officer, "through coercion, 'physical

23   force[,] or a show of authority, in some way restricts the liberty of a person.'" *United States*

24   *v. Washington*, 387 F.3d 1060, 1068 (9th Cir.2004) (quoting *United States v. Chan-Jiminez*,

25   125 F.3d 1324, 1325 (9th Cir. 1997)).

26   Whether an encounter constitutes a seizure is a mixed question of law and fact

27   reviewed de novo. *See United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir.1997).

28   A person is seized when "taking into account all the circumstances surrounding the

1    encounter, the police conduct would have communicated to a reasonable person that he was

2    not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501

3    U.S. 419, 437 (1991).  The operative test set forth by *Bostick* is that a seizure occurs only

4    when "police conduct would have communicated to a reasonable person that the person was

5    not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501

6    U.S. at 439, 111 S.Ct. 2382.

7         Courts have considered similar factors as those addressed under the voluntary consent

8    In Orhorhaghe, the Ninth Circuit identified five factors that aid in determining whether a

9    reasonable person approached by police officers at his residence would have believed that

10   he was "at liberty to ignore the police presence and to go about his business." 38 F.3d at 494

11   (quoting *Florida v. Bostick* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

12   These factors are: (1) the number of officers involved; (2) whether the officers' weapons were

13   displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether

14   the officers' officious or authoritative manner would imply that compliance would be

15   compelled; and (5) whether the officers advised the detainee of his right to terminate the

16   encounter. *Washington*, 387 F.3d at 1068 (citing *Orhorhaghe*, 38 F.3d at 494-96).  In fact,

17   the Ninth Circuit has found an order as simple as a "show hands" by marshals for safety

18   purposes to constitute a seizure under the Fourth Amendment.  *See United States v. Enslin*,

19   327 F.3d 788, 795 (9th Cir. 2003).

20        In this case, the presence of law enforcement officers in front of, behind, and above

21   the Samaniego residence supports a finding of coercive seizure.  The loud and clear presence

22   of law enforcement is a more than adequate substitute for officers with guns drawn.  Nor can

23   one find that this presence was mitigated by any declaration that a search warrant could be

24   obtained or that consent to search could be refused. In fact, the overall circumstances suggest

25   that Agent Garcia's comments of illegal alien activity (without any mention of drug

26   trafficking) implied life-threatening illegal alien activity warranting immediate action. Ergo,

27   this explains Yolanda Luna's comment that, "You'd think this was a murder case," and

28   Defendant Samaniego's statement that, "You are already in." Ms. Luna's comment supports

1    a finding that the circumstances presented to the Defendant were strongly coercive.  Mr.
2    Samaniego's remark is an acknowledgment, by him, that his consent was immaterial because
3    it was obvious to him they were going in.  Taking into account all the circumstances, a
4    reasonable person would not have believed they could have simply ignored the agents and
5    gone about their business.

6        As the government cannot point to any "significant intervening time, space or event"
7    between the unlawful seizure and Samaniego's consent to the search of his home, the
8    government has not shown that there was a break in the chain of events sufficient to refute
9    the inference that the search was the product of the illegal seizure; consequently,
10   Samaniego's consent was tainted and the evidence obtained pursuant to it should have been
11   suppressed." *United States v. Bautista*, 362 F.3d 584, 591 (2004).

12                              **CONCLUSION**

13       It is the recommendation of this Court that the District Judge, after his independent
14   review and consideration, enter an Order **GRANTING** Defendants' Motions to Suppress
15   (Docket # 65 and # 66).

16       Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have ten (10) days from the date of
17   this Report and Recommendation to file written objections to these findings and
18   recommendations with the District Court.  Any objections filed should be filed as CR 06-
19   01819-TUC-RCC.

20       DATED this 24th day of October, 2007.

21
22
23
24   _____
                 Bernardo P. Velasco
             United States Magistrate Judge
25
26
27
28